Eric H. Gibbs (SBN 178658)
ehg@classlawgroup.com
Andre M. Mura (SBN 298541)
amm@classlawgroup.com
David M. Berger (SBN 277526)
dmb@classlawgroup.com
**GIBBS LAW GROUP LLP**
505 14th Street, Suite 1110
Oakland, California 94612
Telephone: (510) 350-9700
Facsimile: (510) 350-9701

*Attorneys for Plaintiff and Proposed Class*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID GRITZ, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>FIRST AMERICAN FINANCIAL CORPORATION, and FIRST AMERICAN TITLE COMPANY,<br><br>Defendants. | Case No. 19-cv-01009<br><br>**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL** |

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

## INTRODUCTION

1. For many, the process of buying and selling real estate is the most significant financial transaction of their lives, both in terms of personal importance and the amount of money involved.

2. Anyone who has closed on a home knows that this process requires reams of paperwork revealing deeply personal details such as proof of identity and income, proof of Social Security numbers, income tax information, and banking information for wire transfers.

3. Knowing full well that safeguarding this information is vitally important, title insurers collect and store this information on secure data management platforms, which are purpose-built to control who has access to the sensitive data they store.

4. But not First American Financial Corporation and First American Title Company—collectively, "First American"—the largest parent / subsidiary title insurer in the nation. Despite explicitly promising customers robust data security as part of the high cost of title services, First American allowed *anyone* to access the sensitive files of millions of customers. Nor is this just a theoretical concern –many, if not all, of the documents were repeatedly accessed before First American was told about the breach.

5. First American made it incredibly easy for the public to access this private information by failing to implement even rudimentary security measures. Suppose that you are a First American customer. The company provides you with a URL to access your documents on its website. That URL might end in "DocumentID= 0000000**5**."

6. Now suppose you want to access someone else's personal file. Type the same URL but alter the Document ID number by one digit—say, "DocumentID= 0000000**6**"—and someone else's personal file will appear. Change the numbers again (and again), and you will reveal still more personal files.

7. It took no computer sleuthing to uncover numbers that will pull personal data; First American's document identification numbers were sequential. Follow that sequence 885 million times—1, 2, 3, 4, and so forth—and you could access all 885 million

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

documents.

8. Because First American breached promises and was negligent in its data security, the American dream of home ownership is now a financial security nightmare, as individuals who did business with this company face a serious threat of identity theft or other financial harms.

9. Plaintiff Gritz, whose data was compromised, seeks compensation for this increased risk of harm, for overpayment for First American's services (which did not include the promised level of privacy, confidentiality, or security), and equitable relief such as business reforms, on behalf of all persons similarly harmed.

## PARTIES

10. Plaintiff David Gritz is a resident and citizen of Pennsylvania.

11. Defendant First American Financial Corporation is a Delaware corporation with its principal place of business in Santa Ana, California.

12. Defendant First American Title Company is a California corporation with its principal place of business in Santa Ana, California. First American Title Company is a subsidiary of First American Financial Corporation.

## JURISDICTION AND VENUE

13. This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d).  This lawsuit is a class action with an amount in controversy over $5 million, involving over 100 proposed class members, some of whom are from a different state from a defendant.

14. This Court may exercise personal jurisdiction over Defendants because they are registered to do business and have their principal place of business in California.

15. Venue is proper in this District under 28 U.S.C. § 1391 because Defendants are headquartered in this District, and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

# FACTUAL ALLEGATIONS

## I. Background on First American's business

16. First American is the largest title insurance company in the United States.[1] It earns $5.3 billion per year in revenue from selling title insurance and other closing services.[2]

17. Other closing services include maintaining escrow accounts and ensuring all necessary documents are signed, the accounting for the transaction is correct, and ownership to the property is properly recorded and transferred.[3]

## II. First American exposes 885 million sensitive documents

18. First American tells prospective customers that it is "equipped with the necessary tools to provide a complete document management program aimed at mitigating risk."[4] As one of the "Benefits of Our Services," First American lists: "Secure access to files."[5] Under "Secure Document Storage," First American says, "We offer secure, reliable, and affordable records storage solutions."[6]

19. First American's document storage solutions were not secure. On May 24, 2019, cybersecurity researcher Brian Krebs announced that 885 million files were available on First American's website for anyone to access.[7] The files contained bank account numbers, Social Security numbers, financial and tax records, and images of drivers' licenses.[8]

20. The data exposure was discovered by a real estate developer, Ben Shoval. Although Mr. Shoval does not have a background in cybersecurity, he quickly realized

---

[1] https://www.alta.org/news/news.cfm?20170905-Title-Industry-Generates-37-Billion-in-Premiums-During-Q2.
[2] First American Title Corp., *10-K for Fiscal Year 2018*, http://s21.q4cdn.com/992793803/files/doc_financials/2018/Annual/2018-FAF-Annual-Report.pdf.
[3] https://firsthomeadvisor.com/the-team/.
[4] https://www.firstam.com/mortgagesolutions/solutions/cleanfile-solutions/document-management.html.
[5] https://www.firstam.com/mortgagesolutions/solutions/foreclosure-reo/asset-closing-services.html.
[6] https://www.firstam.com/mortgagesolutions/solutions/cleanfile-solutions/document-management.html.
[7] https://krebsonsecurity.com/2019/05/first-american-financial-corp-leaked-hundreds-of-millions-of-title-insurance-records/.
[8] *Id.*

-4-

that he had access to many documents he should never have been able to view. Mr. Shoval repeatedly reached out to First American to warn them of the problem, but was ignored. First, he contacted First American's Chief Information Officer. She did not respond. Then, Mr. Shoval contacted First American's Chief Executive Officer, who also ignored him. In a final attempt to stop the exposure, Mr. Shoval contacted cybersecurity researcher and journalist Brian Krebs.

21. Brian Krebs also reached out to First American. Although First American did not respond to Mr. Krebs, the company disabled the portion of its website that allowed access to the records.[9]

### III. First American breaks its privacy promises

22. In its privacy policy, First American makes numerous promises to its customers that it will maintain the security and privacy of their personal information.

23. The very first thing that First American says in its privacy policy is: "We Are Committed to Safeguarding Customer Information."[10]

24. In a later section on "Confidentiality and Security," First American says, "We will use our best efforts to ensure that no unauthorized parties have access to any of your information. We restrict access to nonpublic personal information about you to those individuals and entities who need to know that information … We currently maintain physical, electronic, and procedural safeguards that comply with federal regulations to guard your nonpublic personal information."[11]

25. Additionally, First American says, "We will maintain appropriate … systems to protect against unauthorized access to … the data we maintain."[12]

26. Meanwhile, First American claims the right to keep—indefinitely—sensitive personal information for its own internal use: "We may, however, store such information

---

[9] *Id.*
[10] http://web.archive.org/web/20190525235150/https://www.firstam.com/privacy-policy/index.html.
[11] *Id.*
[12] *Id.*

indefinitely, including the period after which any customer relationship has ceased. Such information may be used for any internal purpose, such as quality control efforts or customer analysis."[13]

27. By indefinitely storing sensitive documents on a publicly-accessible system, First American broke these privacy promises.

28. First American should know better, as it offers its own cybersecurity insurance product to companies in the event of "cyber security breaches, whether the result of cyber-attacks, cyber-crime, or internal carelessness."[14]

## IV. Customers expect the documents they share with First American to stay private

29. Essentially mandatory for obtaining a mortgage, title insurance is extraordinarily expensive. As *Forbes* noted in 2006, First American prices its title insurance at 1,300% above its margin cost.[15] The average policy with First American (in 2006) cost about $1,500, but running a title search—now that records are digitized—costs as little as $25.[16] And First American pays only about $75 per policy to pay claims.[17]

30. Customers believe that—at a minimum—the large sum they pay towards title insurance buys them security and peace of mind that their sensitive documents will be securely stored. As Ben Shoval, the man who discovered the First American breach, explains: "The title insurance agency collects all kinds of documents from both the buyer and seller, including Social Security numbers, drivers licenses, account statements … You give them all kinds of private information and you expect that to stay private."[18]

---

[13] *Id.*
[14] https://web.archive.org/web/20190526024424/https://www.firstam.com/title/agency/agency-insurance/.
[15] Scott Woolley, Inside America's Richest Insurance Racket, Forbes (Oct. 28, 2006), https://www.forbes.com/forbes/2006/1113/148.
[16] *Id.*
[17] *Id.*
[18] https://krebsonsecurity.com/2019/05/first-american-financial-corp-leaked-hundreds-of-millions-of-title-insurance-records/.

## V. First American exposes customers to increased risk of identity theft

31. Cybersecurity researcher Brian Krebs says that mass-harvesting the 885 million records from First American's website "would not have been difficult for even a novice attacker."[19]

32. Krebs notes that "the information exposed by First American would be a virtual gold mine for phishers and scammers."[20]

33. According to FBI data, the costliest form of cybercrimes are ones that "often impersonate real estate agents, closing agencies, title and escrow firms in a bid to trick property buyers into wiring funds to fraudsters."[21]

34. The documents leaked by First American contain not only sensitive information that scammers can use to impersonate real estate sellers, but also contact information for specific closing agents and buyers involved in ongoing real estate transactions.[22]

## VI. First American ignores warnings that identity thieves increasingly targeting the real estate industry

35. In 2017, the FBI warned the real estate industry of a "large spike in cyberattacks specifically targeting real estate companies."[23] The FBI said that between 2016 and 2017, there had been a 480% increase in cyberattacks on the real estate industry.[24]

36. As authentication provider *Auth0* notes, "Real estate tech is also one of the fastest growing tech sectors. High-value areas often draw criminals."[25]

37. First American ignored these warnings and failed to invest in sufficient

---

[19] https://krebsonsecurity.com/2019/05/first-american-financial-corp-leaked-hundreds-of-millions-of-title-insurance-records/.
[20] *Id.*
[21] *Id.*
[22] *Id.*
[23] https://web.archive.org/web/20190526031109/https://auth0.com/blog/amp/cybersecurity-and-cybercrime-in-real-estate-industry/.
[24] *Id.*
[25] *Id.*

privacy and security protections.

38. One commentator noted that "even the most elementary PEN test" would have found this data exposure.[26] A PEN test, also called a penetration test, involves hiring a cybersecurity expert to look for and try to exploit vulnerabilities in the company's privacy and security configurations.

39. Another commentator noted that a routine "application security test" would have analyzed what information was exposed on the company's website to anonymous and regular users that shouldn't have been accessible to them.[27]

40. The failure to conduct sufficient application security testing may be due—in part—to First American's decision to appoint someone whom it hired as an administrative assistant to be the "Head of Enterprise Application Security."[28]

## PLAINTIFF'S EXPERIENCE

41. From 2014 to 2018, Plaintiff David Gritz ran a business purchasing houses in need of improvement, doing renovations, and selling the properties for more than he purchased them.

42. David Gritz was involved in at least 11 real estate transactions where First American was the title insurer. For at least 3 of those transactions, Mr. Gritz used mortgage financing to purchase the house. As the homebuyer, he paid for First American's title insurance services.

43. Mr. Gritz believed, at the time of purchasing title insurance, that First American would maintain the privacy and security of the documents he provided to it.

44. Mr. Gritz would not have used First American as the title insurer had he known that it would expose sensitive documents, making them publicly available over the internet.

---

[26] https://krebsonsecurity.com/2019/05/first-american-financial-corp-leaked-hundreds-of-millions-of-title-insurance-records/comment-page-1/#comments.
[27] *Id.*
[28] https://www.linkedin.com/in/diana-esparza-5377273/.

## CHOICE OF LAW ALLEGATIONS

45. The State of California has sufficient contacts regarding the conduct at issue in this complaint, such that California law may be uniformly applied to the claims of the proposed Class.

46. Defendants do substantial business in California; their headquarters is located in California; and a significant portion of the proposed Nationwide Class is located in California.

47. In addition, the conduct that forms the basis for each and every Class member's claims against Defendants emanated from Defendants' headquarters in Santa Ana, California, where—among other things—Defendants stored customer information in its "cavernous data center"; Defendants set their privacy and compliance policies and practices; and Defendants planned their communications with Class members.

48. The State of California also has the greatest interest in applying its law to Class members' claims. California's governmental interests include not only compensating resident consumers under its consumer protection laws, but also what the State has characterized as a "compelling" interest in using its laws to regulate a resident corporation and preserve a business climate free of unfair and deceptive practices. *Diamond Multimedia Sys. v. Sup. Ct.*, 19 Cal. 4th 1036, 1064 (1999).

49. If other states' laws were applied to Class members' claims, California's interest in discouraging resident corporations from engaging in the sort of unfair and deceptive practices alleged in this complaint would be significantly impaired. California could not effectively regulate a company like First American, which does business throughout the United States, if it can only ensure remuneration for consumers from one of the fifty states affected by conduct that runs afoul of its laws.

## CLASS ACTION ALLEGATIONS

50. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff brings this action on behalf of himself and the following proposed Class:

*All persons who utilized First American's title insurance or other closing services*

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

*in a real estate transaction that involved mortgage financing.*

51. Excluded from the proposed class is Defendants; any affiliate, parent, or subsidiary of Defendants; any entity in which Defendants have a controlling interest; any officer, director, or employee of Defendants; any successor or assign of Defendants; anyone employed by counsel in this action; and any judge to whom this case is assigned, his or her spouse, and members of the judge's staff.

52. **Numerosity**. Members of the proposed class likely number in the millions and are thus too numerous to practically join in a single action. Membership in the class is readily ascertainable from Defendants' own records.

53. **Commonality and Predominance**. Common questions of law and fact exist as to all proposed class members and predominate over questions affecting only individual class members. These common questions include:

   a. Whether First American failed to maintain adequate privacy and security safeguards;

   b. Whether First American was negligent in failing to secure the data as soon as it was informed about the exposure;

   c. Whether First American was contractually obligated to provide adequate privacy and security safeguards;

   d. Whether First American breached its contracts with class members;

   e. Whether California law applies to all Class members' claims;

   f. Whether First American's conduct constitutes a violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200;

   g. Whether First American's conduct, as alleged herein, entitles Class members to damages or restitution, and if so, in what amount;

   h. Whether injunctive relief is appropriate to ensure the future privacy and security of Class members' personal information.

54. **Typicality**. Plaintiff's claims are typical of the claims of the proposed class. Plaintiff and the members of the proposed classes all engaged in a real estate transaction

that utilized First American as the title insurer or closing agent.

55. **Adequacy**. Plaintiff is an adequate representative of the proposed class because his interests do not conflict with the interests of the members of the class he seeks to represent. Plaintiff has retained counsel who are competent and experienced in complex class action litigation, and will prosecute this action vigorously on class members' behalves.

56. **Superiority**. A class action is superior to other available means for the fair and efficient adjudication of this dispute. The injury suffered by each class member, while meaningful on an individual basis, is not of such magnitude as to make the prosecution of individual actions against Defendants economically feasible. Even if class members themselves could afford such individualized litigation, the court system could not. In addition to the burden and expense of managing many actions arising from First American's exposure of 885 million customer files, individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties and the court system presented by the legal and factual issues of the case. By contrast, a class action presents fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

57. In the alternative, the proposed class may be certified because:

   a. the prosecution of separate actions by the individual members of the proposed class would create a risk of inconsistent adjudications, which could establish incompatible standards of conduct for Defendants;

   b. the prosecution of individual actions could result in adjudications, which as a practical matter, would be dispositive of the interests of absent class members or which would substantially impair their ability to protect their interests; and

  c. Defendants have acted or refused to act on grounds generally applicable to the proposed class, thereby making final and injunctive relief appropriate with respect to the members of the proposed class as a whole.

# FIRST CAUSE OF ACTION
**Unlawful, Unfair, and Fraudulent Business Practices**
**Cal. Bus. & Prof. Code § 17200,** *et seq.*
**(on behalf of Plaintiff and the Class)**

58. Plaintiff re-alleges the paragraphs above as if fully set forth herein.

59. Defendants have violated and continue to violate California's Unfair Competition Law (UCL), Cal. Bus. & Prof. Code § 17200, *et seq.*, which prohibits unlawful, unfair, and fraudulent business acts or practices.

60. Defendants' conduct constitutes an "unfair" practice, within the meaning of the UCL, because their conduct was unscrupulous and caused substantial harm. This conduct includes: failing to adequately ensure the privacy, confidentiality, and security of consumer data entrusted to them. Consumers were harmed by having their personal information, including Social Security numbers, made accessible to scammers, identity thieves, and other malicious actors, subjecting them to an impending risk of identity theft. Social Security numbers and drivers' licenses are of particular use to identity thieves, who can utilize this information to perpetrate financial fraud. Consumers were also harmed by overpaying for Defendants' services because they did not receive the promised privacy, confidentiality, and security protections. These harms outweigh any possible benefit from Defendants' conduct.

61. The conduct described above is "unlawful" because it violates Section 5 of the Federal Trade Commission Act, the Consumers Legal Remedies Act, California contract law, and the Gramm-Leach-Bliley Act, which requires organizations to "develop, implement, and maintain a comprehensive information security program" that contains appropriate "administrative, technical, and physical safeguards" to protect the privacy

and security of customers' information. In the alternative, the conduct described above is "unfair" because it violates the policy and spirit of the laws enumerated in this paragraph.

62. The conduct described above is "fraudulent" because it was likely to deceive a reasonable consumer. Defendants failed to disclose, when they had a duty to do so, that they did not intend to comply with the terms of their privacy policy and did not maintain adequate safeguards to ensure the privacy, confidentiality, and security of consumers' personal information.

63. Had Defendants disclosed this information, Plaintiff would not have used their services or would have paid substantially less for those services.

64. A reasonable consumer would attach importance to information that indicated their personal information would not be safe and secure in Defendants' possession.

65. As a direct and proximate result of Defendants' business practices, Plaintiff and the proposed class members suffered injury in fact and lost money or property, because they purchased and paid for services that they otherwise would not have, or in the alternative, would have paid less for.

66. Plaintiff and the proposed Class members are entitled to restitution and other equitable relief, including an order directing Defendants to adequately ensure the privacy, confidentiality, and security of their information, and reasonable attorneys' fees and costs.

## SECOND CAUSE OF ACTION

**Violation of the Consumers Legal Remedies Act**

**Cal. Civ. Code § 1750,** *et seq.*

**(on behalf of Plaintiff and the Class)**

67. Plaintiff re-alleges the paragraphs above as if fully set forth herein.

68. The CLRA proscribes "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale of goods or services to any consumer."

69. Defendants are "persons" within the meaning of the CLRA. Cal. Civ. Code § 1761(c).

70. Title insurance is a "service" within the meaning of Cal Civ. Code § 1761(b).

71. Plaintiff and members of the Class are "consumers" within the meaning of the CLRA. Cal. Civ. Code §§ 1761(d).

72. As alleged herein, Defendants made numerous representations and omissions concerning the adequacy of their privacy, security, and confidentiality safeguards.

73. Defendants' conduct violated the CLRA, including—at least—the following enumerated CLRA provisions: Cal. Civ. Code § 1770(a)(5) by representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have; § 1770(a)(7) by representing that goods or services are of a particular standard, quality, or grade, if they are of another.

74. As alleged herein, the Defendants distributed, marketed, and advertised their services to Class members while misrepresenting and concealing material facts about those services.

75. As a direct and proximate result of Defendants' representations and omissions, Plaintiff and the proposed class members suffered injury in fact and lost money or property, because they purchased and paid for services that they otherwise would not have, or in the alternative, would have paid less for.

76. This cause of action seeks only injunctive relief at this time. However, Plaintiff is sending a demand letter to each Defendant via certified mail pursuant to the requirements of the CLRA, providing the notice required by Cal. Civ. Code § 1782(a). If Defendants do not correct or otherwise rectify the harm alleged by Plaintiff in his letter or this Complaint within the statutorily proscribed thirty-day period, Plaintiff will amend this Complaint to seek monetary damages against Defendants pursuant to Cal. Civ. Code §§ 1781 and 1782.

77. Plaintiff further seeks an order awarding costs of court and attorneys' fees under Cal. Civ. Code § 1780(e).

# THIRD CAUSE OF ACTION

## Breach of Contract

### (on behalf of Plaintiff and the Class)

78. Plaintiff re-alleges the paragraphs above as if fully set forth herein.

79. Plaintiff and Class members entered into a contract with First American for the provision of title insurance or other closing services.

80. The terms of First American's privacy policy are part of the contract.

81. Plaintiff and Class members performed substantially all that was required of them under their contract with First American, or they were excused from doing so.

82. First American failed to perform its obligations under the contract, including by failing to provide adequate privacy, security, and confidentiality safeguards for Plaintiff's and Class member's information and documents.

83. As a direct and proximate result of First American's breach of contract, Plaintiff and Class members did not receive the full benefit of the bargain, and instead received title insurance or other closing services that were less valuable than described in their contracts. Plaintiff and Class members, therefore, were damaged in an amount at least equal to the difference in value between that which was promised and Defendants' deficient performance.

84. Also as a result of Defendants' breach of contract, Plaintiff and Class members have suffered actual damages resulting from the exposure of their personal information, and they remain at imminent risk of suffering additional damages in the future.

85. Accordingly, Plaintiff and Class members have been injured by Defendants' breach of contract and are entitled to damages and/or restitution in an amount to be proven at trial.

## FOURTH CAUSE OF ACTION

### Unjust Enrichment

### (on behalf of Plaintiff and the Class)

86. Plaintiff re-alleges the paragraphs above as if fully set forth herein.

87. Defendants received a benefit from Plaintiff and the Class in the form of payments for title insurance or other closing services.

88. The benefits received by Defendants were at Plaintiff's and the Class's expense.

89. The circumstances here are such that it would be unjust for Defendants to retain the portion of Plaintiff's and the Class's payments that should have been earmarked to provide adequate privacy, security, and confidentiality safeguards for Plaintiff's and Class members' personal information and documents.

90. Plaintiff and the Class seek disgorgement of Defendants' ill-gotten gains.

## FIFTH CAUSE OF ACTION

### Negligence Per Se

### (on behalf of Plaintiff and the Class)

91. Plaintiff re-alleges the paragraphs above as if fully set forth herein.

92. Defendants had a duty of care under Section 5 of the Federal Trade Commission Act, the Consumers Legal Remedies Act, and the Gramm-Leach-Bliley Act.

93. These laws were designed to protect consumers from the types of injuries alleged in this complaint.

94. Defendants breached their duty of care by violating Section 5 of the Federal Trade Commission Act, the Consumers Legal Remedies Act, and the Gramm-Leach-Bliley Act.

95. As a direct and proximate result of Defendants' breach of their duty of care, Plaintiff and the Class suffered injury, as alleged above, in an amount subject to proof.

## SIXTH CAUSE OF ACTION

### Negligence

### (on behalf of Plaintiff and the Class)

96. Plaintiff re-alleges the paragraphs above as if fully set forth herein.

97. First American had a duty of reasonable care to safeguard the privacy, confidentiality, and security of Plaintiff's and Class members' personal information and documents and comply with the terms of its own privacy policy.

98. First American breached this duty of care by failing to adequately safeguard the privacy, confidentiality, and security of Plaintiff's and Class members' personal information and documents.

99. As a direct and proximate result of Defendants' breach of their duty of care, Plaintiff and the Class suffered injury, as alleged above, in an amount subject to proof.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that the Court enter a judgment awarding the following relief:

a. An order certifying the proposed class, and appointing Plaintiff's counsel to represent the class;

b. An order declaring Defendants' conduct to be unlawful;

c. An order awarding Plaintiff and the Class members damages, restitution, disgorgement, and/or any other form of monetary relief provided by law (but not damages under the CLRA);

d. An order issuing a permanent injunction against Defendants;

e. An order awarding Plaintiff and the Class pre-judgment and post-judgment interest as allowed under the law;

f. An order awarding Plaintiff and the Class's reasonable attorneys' fees and costs of suit; and

g. An order awarding such other and further relief as the Court deems just and proper.

# JURY DEMAND

Plaintiff demands a trial by jury for all issues so triable.

DATED: May 27, 2019

**GIBBS LAW GROUP LLP**

*/s/     Eric H. Gibbs*

Eric H. Gibbs (SBN 178658)
Andre M. Mura (SBN 298541)
David M. Berger (SBN 277526)
505 14th Street, Suite 1110
Oakland, California 94612
Telephone:   (510) 350-9700
Facsimile:    (510) 350-9701
ehg@classlawgroup.com
amm@classlawgroup.com
dmb@classlawgroup.com

*Attorneys for Plaintiff and Proposed Class*